**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| NAJEE DEVONTAE JAMES<br>Plaintiff,<br><br>v.<br><br>COOK COUNTY DEPARTMENT OF<br>CORRECTIONS, et al.<br><br>Defendants. | Case No 23-cv-743<br><br>Hon. Judge Franklin U.<br>Valderrama |

**ORDER**

The Fourteenth Amendment requires jail officials to "safeguard the health and safety of pretrial detainees and section 1983 provides a cause of action for detainees to vindicate those constitutional guarantees."[1] Plaintiff Najee Devontae James is and was a pretrial detainee at the Cook County Department of Corrections (CCDOC). R.[2] 47, Third Amended Complaint (TAC).  According to James, while in pretrial custody, he was beaten, sexually assaulted, and denied medical care. James sued Thomas Dart, the Sherriff of Cook County, along with a group of CCDOC officers, directors, and related medical personnel under 42 U.S.C. § 1983 for violations of his constitutional rights. Presently before the Court is a motion to dismiss brought by a subset of the Defendants—Dart, Johnson, Yoksoulian, Peraino, Lucente, and Acey (collectively, Defendants)—for failure to state a claim under Federal Rule of Civil

---

[1] *Gonzalez v. McHenry Cnty.*, 40 F.4th 824, 827 (7th Cir. 2022).
[2] Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

Procedure 12(b)(6). R. 65, Mot. For the reasons stated herein, the Court grants in part and denies in part Defendants' motion.

### Background[3]

Plaintiff Najee Devontae James was at all relevant times a pretrial detainee of CCDOC. TAC ¶ 4. As the TAC asserts different allegations against each Defendant, the Court addresses the allegations against each Defendant separately, where appropriate.

A. **Defendant Yoksoulian**

On June 10, 2022, James was sent from CCDOC to the Cermak Section (Cermak) of CCDOC for medical services because of a suicide attempt. *Id.* ¶ 21. The staff at Cermak subsequently ordered that James be transferred to Stroger Hospital. *Id.* ¶ 22. Defendant Martha Yoksoulian, a CCDOC officer, was responsible for managing the day-to-day operations of the CCDOC. *Id.* ¶ 10. James contends that Yoksoulian was also responsible for implementing and executing the policies of the External Operations Section (ExOps) at CCDOC. *Id.* James alleges on information and belief that Yoksoulian created a list for self-harm pre-trial detainees called the "Foreign Body Ingestors," or "F.B.I" list. *Id.* ¶ 23. James alleges that Yoksoulian ordered individuals on the F.B.I. list to be placed last on the pickup list by ExOps for transfer to Stroger. *Id.* ¶ 25. Yoksoulian, according to James, implemented a policy requiring ExOps to hold F.B.I. list detainees for at least twenty-four hours before an emergency medical transfer. *Id.* ¶ 26. After receiving the order to transfer James to

---

[3] The Court accepts as true all of the well-pleaded facts in the complaint and draws all reasonable inferences in favor of the James. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

Stroger Hospital, the ExOps waited over twenty-four hours before transporting him to Stroger Hospital. *Id.* ¶ 27.

### B. Defendant McGonegal

On October 1, 2022, following a death in his family, James experienced suicidal thoughts and was seen by Margaret McGonegal, a licensed clinical professional counselor at Cermak. *Id.* ¶ 11. During the visit, James informed McGonegal that he was suicidal due to a death in his family. *Id.* ¶ 29. McGonegal dismissed his suicidal thoughts and refused to send James to the psychiatric unit in Cermak. *Id.* ¶ 31. As a result, James continued to suffer from depression, which caused him to cut his arm and wrist after returning to his cell. *Id.* ¶ 33-34. Two days later, James was sexually assaulted by his cellmate. *Id.* ¶ 35. That same day, James informed "multiple CCDOC staff members" of the sexual assault but was ignored. *Id.* ¶ 36. On October 5, two days after his sexual assault, James was sent to Cermak. *Id.* ¶ 37.

### C. Defendant Dr. Tawadros

At Cermak, James saw Dr. Mina Tawadros. *Id.* ¶ 38. James thought the consultation was for him to discuss the October 2022 sexual assault. *Id.* Dr. Tawadros, however, informed him that he was sent to Cermak only for the injuries to his left arm. *Id.* James told Dr. Tawadros that he had filed a grievance and submitted a health form regarding the October 2022 sexual assault, and explained he was sent to Cermak by Sgt. Szul. *Id.* ¶¶ 40, 41. Dr. Tawadros then advised against any treatment for the sexual assault, but James persisted. *Id.* ¶ 43. Despite his persistence, Dr. Tawadros "denied James a sexual assault kit and sent James to sit

outside in the cages" and cleared him to return to his cell at CCDOC. *Id.* ¶ 44. James, however, refused to leave Cermak until he received a sexual assault kit. *Id.* ¶ 45. When Sgt. Szul and another officer were called to escort James back to his cell, James explained the incident to Sgt. Szul, who then spoke to Dr. Tawadros. *Id.* ¶¶ 46-47. During that conversation, Dr. Tawadros falsely told Sgt. Szul that James refused the sexual assault kit. *Id.* ¶ 48.

On December 27, 2022, James was again sexually assaulted by another detainee. *Id.* ¶ 75. On December 30, 2022, James was sent to Cermak for a rape kit and was again seen by Dr. Tawadros. *Id.* ¶ 76, 77. Dr. Tawadros told James that she did not believe that he had been raped and refused to allow James to go to Stroger Hospital. *Id.* ¶ 78. On January 1, 2023, James was seen by another doctor at the psychiatric unit. *Id.* ¶ 80. The doctor placed an order to send James to Stroger for a rape kit. *Id.* ¶ 81. James received the rape kit the next day but was informed that no evidence could be collected. *Id.* ¶ 83. James attributes this issue to the delay initiated by Dr. Tawadros's refusal to send him to Stroger. *Id.* ¶ 83.

### D. Defendant John Doe

On October 14, 2022, James was housed in a cell with an active alert indicating that he should not have a cellmate. *Id.* ¶¶ 50-51. On that date, Defendant CO John Doe permitted another inmate to enter James's cell. *Id.* ¶ 49. The unknown inmate beat, strangled, and raped James at knifepoint throughout the night. *Id.* ¶ 52. The next day James was placed in segregation. *Id.* ¶ 53. Following the assault, James did not receive any medical or mental health treatment for his injuries. *Id.* ¶ 54.

4

### E. Defendant Johnson

On November 11, 2022, James attempted suicide while in segregation. *Id.* ¶ 55. As a result, James was "supposed to be sent" to a psychiatric unit. *Id.* ¶ 56. However, following his suicide attempt, James was placed in a holding cage in the basement at Cermak and confined in a blue box and restraints for three consecutive days. *Id.* ¶ 57. According to James, Defendant Wilesha Johnson, a CCDOC officer, implemented a policy by which any incarcerated individual labeled as a "green suit inmate" would be subject to a "blue box" for hours and days at a time in handcuffs and a belly chain in the "back cages" of the Cermak basement while waiting to be seen by Cermak medical staff, conditions James endured each time he was sent to Cermak's basement *Id.* ¶¶ 57-63.

### F. Defendant Sellers

On November 13, 14, 15, and 16, 2022, James swallowed a handful of needles in a suicide attempt. *Id.* ¶ 64. Defendant Thelma Sellers, a nurse at CCDOC at Cermak, denied James any medical treatment following his suicide attempts. *Id.* ¶ 65. Rather, James alleges that she cleared him without any medical attention. *Id.* ¶ 66.

### G. Defendant Dr. Khan

On December 19, 2022, James was sent to Cermak with symptoms of diarrhea and vomiting. *Id.* ¶ 69. Upon arriving at Cermak, James was seen by Dr. Marghoob Khan. *Id.* ¶ 70. James described his symptoms to Dr. Khan and informed her that he

was in pain. *Id.* ¶ 71. Dr. Khan, without examining James, told him he would be okay. *Id.* ¶ 72. Following the visit, Dr. Khan sent James back to his unit. *Id.* ¶ 74.

### H. Defendant Lucente

Defendant Michael Lucente was at all relevant times a CCDOC officer at James's facility with the rank of Director. *Id.* ¶ 18. On or about February 16, 2023, James was called into Lucente's office. *Id.* ¶ 84. Lucente asked James to inform him on "dirty" officers and nurses at CCDOC. *Id.* ¶ 85. When James insisted that he did not know of any, Lucente threatened to keep James on "out alone/house alone" status for an extended period of time if he refused to comply. *Id.* ¶¶ 86-87. After their meeting, James filed grievances against Lucente related to these threats. *Id.* ¶ 88. Following the submission of James's grievances, Lucente ordered James to remain on out alone/house alone status. *Id.* ¶ 89.

### I. Defendants Peraino and Acey

On April 28, 2023, James informed A. Peraino, a CCDOC correctional officer, that he wanted to file a sexual assault incident report. *Id.* ¶ 90. Peraino told James that he would not act on his request until he returned to his cell, subsequently ordering several officers to use force to bring James back to his cell. *Id.* ¶¶ 91-92. During this incident, "while James was restrained by a belly chain, handcuffs, and confined in a blue box," Defendant K. Acey, another CCDOC correctional officer, punched James repeatedly on his right temple, causing injuries. *Id.* ¶ 93.

James sued the Defendants, asserting Fourteenth Amendment claims against Defendants Yoksoulian (Count I); McGonegal (Count II); Dr. Tawadros (Count III);

John Doe (Count IV); Johnson (Count V); Sellers (Count VI); Khan (Count VII); a First Amendment claim against Lucente (VIII); Fourteenth Amendment claims against Peraino (Count IX); and Acey (Count X); and a *Monell* claim against Dart (Count XI). R. 47. Before the Court is the Defendants Dart, Johnson, Peraino, Lucente, and Acey's fully briefed motion to dismiss the TAC under Federal Rule of Civil Procedure 12(b)(6). *See* Mot.

### Legal Standard

A Rule 12(b)(6) motion to dismiss challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## Analysis

### I. Qualified Immunity as to Defendants Lucente, Acey, and Peraino

Defendants Lucente, Acey, and Peraino argue that James's claims against them are barred by the doctrine of qualified immunity. R. 65, Mot. at 11-12. Qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017) (cleaned up).[4] "The doctrine of qualified immunity balances dueling interests—allowing officials to perform their duties reasonably without fear of liability on the one hand and affording members of the public the ability to vindicate constitutional violations by government officials who abuse their offices on the other." *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 987 (7th Cir. 2021) (cleaned up). "The purpose of qualified immunity is to protect 'all but the plainly incompetent or those who knowingly violate the law.'" *Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Crucially, when a defendant raises qualified immunity, the burden shifts to the plaintiff to defeat this defense. *See Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 2722 (2020); *see also Buchanan v. Pfister*, 2020 WL 902829, at *12 (N.D. Ill. Feb. 25, 2020). Here, Defendants Lucente, Acey, and Peraino have properly raised a qualified immunity defense. As a result, the burden shifts to

---

[4] This Order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

James to defeat this defense. *See Buchanan*, 2020 WL 902829, at *12; *see also Leiser*, 933 F.3d at 701. A plaintiff may defeat qualified immunity by showing that (1) the defendant's conduct violated a constitutional right, and (2) the violated right was clearly established at the time of the alleged misconduct. *Lewis v. Downey*, 581 F.3d 467, 478 (7th Cir. 2009). A court can choose which element to address first. *Lopez*, 993 F.3d at 987.

As to the second element, "[a] plaintiff can show that a right is 'clearly established' by statute or constitution in at least two ways: (1) he can point to an analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was 'so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)). A right is "clearly established" if the conduct is so clearly prohibited that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). There need not be a case exactly on point for a right to be clearly established, but "existing precedent must place the lawfulness of the particular arrest beyond debate." *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (cleaned up); *see also Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016). Still, the right must have been clearly established "in a particularized sense, rather than at a high level of generality." *Id.* Put another way, "the official must have [had] fair warning that his conduct [was] unconstitutional." *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011) (cleaned up).

9

As an initial matter, James argues that Defendants' qualified immunity argument is premature at the motion to dismiss stage. R. 70, Resp. at 12. On a more substantive basis, James insists that his allegations against Lucente, Acey, and Peraino survive the qualified immunity inquiry at this stage. *Id.* at 13-16. James is correct that the Seventh Circuit has explained that "[b]ecause a qualified immunity defense so closely depends on the facts of the case, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). However, dismissal based on qualified immunity "may be appropriate at the pleading stage where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred." *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (cleaned up). It is within this framework that the Court examines Defendants' qualified immunity arguments.

### A. Defendant Lucente

The Court begins with Defendant Lucente. Recall that after James declined Lucente's invitation to snitch on "dirty" officers and nurses, Lucente threatened to keep James on "out alone/house alone" status. After James filed a grievance, Lucente, according to James, acted on this threat and ordered that James remain on out alone/house alone status. In contending that Lucente violated his clearly established constitutional right, James points to *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012), in which the Seventh Circuit found that the plaintiff adequately alleged a violation of his First Amendment right to use the prison grievance system. After filing

10

a grievance, the plaintiff was retaliated against by being sent to another facility where he had "known enemies." *See id.*

The first prong of the qualified immunity analysis is satisfied, because a pretrial detainee, like a prisoner, "has a First Amendment right to make grievances about conditions of confinement." *Id.* (quoting *Watkins v. Kasper,* 599 F.3d 791, 798 (7th Cir. 2010)). As to the second, James maintains that *Gomez* demonstrates that this right was clearly established at the time of its alleged violation. *See* Resp. at 13-14. From James's perspective, Lucente's alleged retaliation after the submission of his grievance violated his First Amendment right and deterred future First Amendment activity. In reply, Defendants do not address *Gomez* as it relates to their qualified immunity argument. *See* R. 71, Reply at 6-8. Instead, they merely argue that James does not state "that he was not able to file a grievance." *Id.* at 7. Defendants miss the point. True, James was able to file his initial grievance against Defendant Lucente, but James's central contention is that Lucente retaliated against him for exercising a constitutionally protected right.

Recall that James has the burden of establishing that his right was clearly established. The only case James cites, *Gomez* does not accomplish that task. In *Gomez,* for his First Amendment retaliation claim, the plaintiff alleged that his retaliatory transfer was a direct result of his grievance. Specifically, he alleged that the IDOC Director sent an investigator to threaten the plaintiff with a transfer to another prison if he pursued his grievance. Even after the plaintiff indicated that he would no longer pursue his grievance or file a lawsuit if he could stay at his current

11

prison, he was told it was "too late." No other explanation for the plaintiff's transfer was advanced. *Gomez*, 680 F.3d at 866-67. Here, by contrast, James does not allege that the filing of his grievance was the direct cause of his continuation on out alone/house alone status. Rather, James alleges that Defendant Lucente ordered this continuation due to James's refusal to snitch on "dirty" officers and nurses. In other words, and unlike the situation in *Gomez*, there is no connection between James's filing of his grievance and any alleged First Amendment retaliation. Before James ever filed his grievance, he had already been told that his failure to reveal dirty correctional officers would have adverse consequences. As such, the Court finds that James does not satisfy his burden with respect to the "clearly established" prong of the qualified immunity analysis as it applies to Defendant Lucente, and therefore holds that his claim against Defendant Lucente is barred.

### B. Defendant Acey

James alleges that Defendant Acey punched him repeatedly in the right side of the head "while [he] was restrained by a belly chain, handcuffs, and confined in a blue box." TAC ¶ 93. Notably, James admits that he does not point to a case directly on point concerning Defendant Acey's conduct. Resp. at 15-16. Recall that a plaintiff may satisfy the "clearly established" prong of the qualified immunity analysis" by (1) pointing to an analogous case establishing the right to be free from the conduct at issue; or (2) showing that the conduct was so egregious that no reasonable person could have believed that it would not violate clearly established rights. *Steidl*, 494 F.3d at 632. Here, James follows the second route. *See* Resp. at 15-16. If no case exists

that is directly on point, the Court must examine "all relevant case law in order to determine whether there was such a clear trend in the case law that [it] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010) (cleaned up). Officials can be "on notice that their conduct violates established law even in the absence of earlier cases involving fundamentally similar or materially similar facts." *Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir.1996) ("Under the doctrine of qualified immunity, liability is not predicated upon the existence of a prior case that is directly on point.").

Courts in this circuit have held that punching a confined prisoner constitutes a violation of the prisoner's constitutional rights. *See Alvarado v. Milwaukee County*, 2019 WL 2075972 (E.D. Wis. May 10, 2019) ("At this stage, the plaintiff's allegations that Jackson punched him and used her taser on him are sufficient to state a claim against her [under Fourteenth Amendment]."). Defendants argue that James's allegations about Acey are "simply not plausible" because they are "merely conclusory assertions the Court need not accept." Reply at 8. Defendants' argument misses the mark. Under applicable case law, James's allegations are sufficient at this stage to demonstrate that Defendant Acey's conduct amounted to a violation of James's clearly established constitutional rights, effectively defeating Defendant Acey's qualified immunity defense at this stage.

13

### C. Defendant Peraino

Finally, the Court evaluates whether qualified immunity bars James's claim against Defendant Peraino. James alleges that he informed Defendant Peraino that he sought to file a sexual assault incident report. Peraino told James that he would not act on his request until he returned to his cell, subsequently ordering several officers to force James back to his cell, during which altercation Defendant Acey punched James repeatedly in the head. In support of his contention that this right was clearly established, James leans on *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005). In *Budz*, the Seventh Circuit held that a defendant violates a prisoner's constitutional rights when he knows of "highly probable attacks." *Id.* at 911. "[A] 'substantial risk' could exist where prison officials place a detainee in a cell in which 'they know that there is a cobra there or at least a high probability of a cobra there.'" *Id.* (quoting *Billman v. Ind. Dept. of Corr.*, 56 F.3d 785, 788 (7th Cir. 1995)). Specifically, the plaintiff in *Budz*—a Caucasian man—demonstrated that the defendants failed to protect him from another prisoner who had a known propensity to attack Caucasian prisoners. *See id.*

Here, by contrast, James alleges that Defendant Peraino failed to protect him from harm by not allowing him to file a grievance before he was back in his cell and by ordering other officers to physically force him back into the cell. From James's point of view, Defendant Peraino "ignored Plaintiff's request, dismissed the matter, and directed officers to use force to return Plaintiff to his cell." Resp. at 15. James contends that "this disregard mirrors the examples outlined in *Budz*." *Id.* The Court

14

disagrees. Unlike the plaintiff in *Budz*, James does not allege that he was at particular risk of harm due to Defendant Peraino's failure to act, nor does he argue that Defendant Peraino knew of any particular high risk of him being subject to violence. Defendant Peraino telling James that he would not discuss the matter until he was back in his cell is a far cry from the defendants in *Budz* allowing an inmate with a known propensity for violence against Caucasian individuals to be given access to a common recreation room where he subsequently assaulted the Caucasian plaintiff. *See Budz*, 398 F.3d at 910-12. Defendants argue, and the Court agrees, that Defendant Peraino did not prevent James from filing a grievance, but rather informed James that he first needed to go back to his cell. *See* Reply at 7-8. James also fails to establish that Defendant Peraino ordered, or even could have predicted, the level of force subsequently used by Defendant Acey. Such conduct, based on James's own allegations, fails to establish that Defendant Peraino violated James's clearly established constitutional rights. Accordingly, James's claim against Defendant Peraino is barred under qualified immunity.

The Court now turns to Defendants' 12(b)(6) arguments for dismissal.

## II.   James's Fourteenth Amendment Claim Against Defendant Acey

James alleges that Defendant Acey violated his Fourteenth Amendment right to be free from excessive force by repeatedly punching him in the right temple while he was restrained.

Defendants argue that James fails to state a claim of excessive force, noting that James's allegations against Defendant Acey constitute only one sentence and

15

lack sufficient detail. *See* Mot. at 8, Reply at 5-6. The way Defendants see it, James's allegations as to Defendant Acey are "conclusory" and need not be accepted by the Court. Mot. at 10, Reply at 5. Moreover, Defendants argue, "*de minimis* uses of force do not implicate the Eighth Amendment." Reply at 5.

To state a claim for excessive force, a pretrial detainee must allege that the defendant "purposefully or knowingly" used force against him, and that that force was "objectively unreasonable." *Morehead v. Milwaukee Cnty. Police Dep't*, 2018 WL 1175356, at *2 (E.D. Wis. Mar. 5, 2018) (quoting *Kingsley v. Hendrickson*, 576 U.S, 389, 398 (2015)).

To begin, the Court is perplexed by Defendants' reference to the Eighth Amendment, especially after James correctly stated the correct standard for pretrial detainees lies under the Fourteenth Amendment. *See* Resp. at 10-11. This distinction matters. In *Kingsley v. Hendrickson*, the Supreme Court held that "a pretrial detainee can prevail [on an excessive force claim] by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." 576 U.S, 389, 396-97 (2015). Further, "[t]he language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Id.* at 400-01. Thus, in analyzing an excessive force claim under the Fourteenth Amendment, "there is no need . . . as there might be in an Eighth Amendment case, to determine when punishment is unconstitutional." *Id.* at 401. In evaluating

16

Fourteenth Amendment excessive force claims, courts "may consider several factors, including the relationship between the need to use force and the amount of force used, the extent of the plaintiff's injury, any effort by the officer to limit his or her use of force, the severity of the security concern, and the threat perceived by the officer." *Thompson v. Cook County*, 2023 WL 2838449, at *3 (citing *Kingsley*, 576 U.S. at 397).

The Court nevertheless disagrees with Defendants' central position that Defendant Acey's repeated punches to James's head were in any way "*de minimis*." *See* Reply at 5-6. Nothing in the complaint supports that conclusion, and indeed, case law has found the opposite: "examples of force greater than *de minimis*, which could support an excessive force claim include: punching a prisoner with a closed fist." *Jackson v. Stubenvoll*, 2022 WL 991950, at *4 (N.D. Ill. Mar. 31, 2022) (citing *Thomas v. Stalter*, 20 F.3d 298, 301-02 (7th Cir. 1994) ("A punch in the face to subdue Mr. Thomas was not necessary to carry out the court order.")). The Court is additionally unpersuaded by Defendants' assertion that James's allegations are conclusory. In support, they cite *Ashcroft v. Iqbal*, 556 U.S. at 678-79 and *Kingsley v. Hendrickson*, 576 U.S. 389, 398-99 (2015) but proffer little additional reasoning as to why James's allegations about Defendant Acey's punches and his resulting injuries are in any way conclusory. *See* Reply at 5-6. Ironically enough, Defendants' argument skews more conclusory than James's. James alleges that Defendant Acey "punched [him] repeatedly in the right side of the temple resulting in injuries" "while [he] was restrained by a belly chain, handcuffs, and confined in a blue box." TAC ¶ 93. Repeated punches to the head, especially while James was allegedly restrained,

17

extend beyond the bounds of reasonable force. Accordingly, James sufficiently states an excessive force claim against Defendant Acey.

### III.    James's Claims Against Defendants Johnson and Yoksoulian

James sues both Defendants Johnson and Yoksoulian in their official capacities. "Government officials can be sued in their official capacity (which is really a claim against the government entity), their individual capacity (which is a claim against the official personally), or both." *Lamb v. Cty. of Lake*, 2021 WL 4306144, at *4 (N.D. Ill. Sept. 22, 2021). To maintain an official-capacity suit under § 1983, a plaintiff must show that his injury resulted from the execution of an official policy, custom, or practice. *Monell v. Dep't of Social Services,* 436 U.S. 658, 694 (1978). Moreover, "a plaintiff suing a public employee in his official capacity cannot obtain relief unless that defendant has final policy making authority." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also Long v. Mercer County, Ill.*, 795 F. Supp. 873, 876 n.1 ("To sue [defendant] in his official capacity, Plaintiff must allege that [he] acted pursuant to an official policy, custom, or practice, or that he was a municipal policy maker with final policy making authority relative to the acts complained of.").

James alleges that Defendants Johnson and Yoksoulian implemented or administered policies that caused James significant harm. As to Defendant Johnson, James asserts that she "created a policy for green suit inmates," requiring these prisoners "to be restrained in a blue box for hours and days at a time in handcuffs and a belly chain, in the back cages in the Cermak Section basement while waiting to be seen by medical staff." TAC ¶¶ 59-63. As for Defendant Yoksoulian, James

18

alleges that he created an "F.B.I. list" and "implemented a policy" requiring that individuals on the list to be put last on the pickup list for transfer to Stroger Hospital, resulting in James's transfer being delayed. *Id.* ¶¶ 23-27.

Defendants argue that Defendants Johnson and Yoksoulian are not final policymakers and therefore cannot be held liable for actions taken in their official capacity. Mot. at 5-7. James, in reply, "acknowledges that his claims against Yoksoulian and Johnson in their official capacities are . . . effectively claims against Sheriff Dart." Reply at 5. Nevertheless, James insists that these claims remain viable because his injuries were caused by an official policy or practice carried out within the scope of Yoksoulian and Johnson's official duties. *Id.* James maintains that further factual discovery is necessary to determine whether Defendants Yoksoulian and Johnson have policymaking authority on the actions in question. Resp. at 5-6 (citing *Novick v. Village of Bourbonnais*, 695 F. Supp. 3d 1011, 1030 (C.D. Ill. 2023)). But *Novick*, as Defendants correctly point out, is distinguishable. *See* Reply at 1-2. The *Novick* court held that the police chief defendant could be considered a final policy maker after a press conference revealed that the police chief "retains complete authority over how criminal investigations are conducted" and that he is therefore a "final policymaker." *Id.* at 1030 (quoting *Logan v. City of Evanston*, 2020 WL 6020487, at *6, (N.D. Ill. Oct. 12, 2020)). Here, James does not allege that Defendants Johnson or Yoksoulian retained similar policy-making authority.

Although James alleges that Defendants Johnson and Yoksoulian effectively "created" and "implemented" the policies which caused his injuries, he does not allege

19

that either Defendant possessed the requisite "final policy-making authority" to satisfy *Monell. See Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 676 (7th Cir. 2009) ("Officials with final decisionmaking authority are deemed policymakers for *Monell* purposes."). Indeed, James concedes that his claims against Defendants Yoksoulian and Johnson are essentially claims against Sheriff Dart. As such, the Court agrees with Defendants Johnson and Yoksoulian that they are not final policymakers for *Monell* purposes and consequently holds that James's official capacity claims against them must be dismissed.

## IV.    James's *Monell* Claim Against Defendant Dart

James brings a claim for *Monell* liability against Sheriff Dart for the actions committed by the other named Defendants. Under *Monell*, a municipality may be "on the hook" for decisions "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Cozzi v. Village of Melrose Park*, 592 F. Supp. 3d 701, 714 (N.D. Ill. 2022) (citing *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (2018)). Sheriff Dart—in his official capacity as the head of the Sheriff's Office—may be liable under § 1983 only if the alleged constitutional violations resulted from the execution of one of its policies. *Monell*, 436 U.S. at 694. "This may be established by alleging: (1) an express policy that caused the constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled that it constitutes a policy; or (3) that the constitutional injury was caused by a person with final policymaking authority." *Armour v. Country Club Hills*, 2014 WL 63850, at *5

20

(N.D. Ill. Jan. 8, 2014) (citing *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007)).

In response to Defendants' argument that he failed to adequately allege a plausible *Monell* claim, James focuses solely on whether Sheriff Dart possesses "final policymaking authority," arguing that discovery is needed to answer this question. Resp. at 16-17. But that is not the relevant question before the Court. As an initial matter, it is uncontested that Sheriff Dart retains final policymaking authority. *See Wuerffel v. Cook Cnty. Sheriff's Off.*, 2016 WL 1660497, at *6 (N.D. Ill. Apr. 27, 2016) ("In Illinois, a sheriff has final policy-making authority."). Crucially, however, James does not allege that Sheriff Dart himself caused his injuries. The Court therefore focuses its attention on the first two *Monell* factors: whether there exists an express policy or widespread practice that caused his constitutional deprivation. As to the actions taken by Defendants Johnson and Yoksoulian, Defendants argue that James fails to adequately allege that the "F.B.I." list or green suit regulations were express policies or widespread practices. Mot. at 14. The Court agrees with Defendants. In sum, James has not alleged that the actions taken by Defendants Yoksoulian and Johnson constituted an express policy, a widespread, permanent, well-settled practice, or that Sheriff Dart caused his injuries. *See Armour*, 2014 WL 63850, at *5.

The same reasoning applies to James's *Monell* claim as it relates to the actions taken by the other Defendants, namely concerning improper responses to sexual assaults and suicide attempts. Defendants argue, and the Court agrees, that James does not allege any widespread practice or policy connected to the treatment he

21

received, nor does he point to any causal link between the injuries he suffered and his treatment. Mot. at 14; *see also Cozzi*, 592 F. Supp. 3d at 713-14 ("The plaintiff also must establish 'the requisite causation,' meaning 'the policy or custom was the moving force behind the constitutional deprivation.'") (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). Accordingly, James's *Monell* claim against Sheriff Dart is dismissed.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants Dart, Johnson, Yoksoulian, Peraino, Lucente, and Acey's motion to dismiss James's Third Amended Complaint [65]. The Court grants the motion as to James's claims against Defendants Dart, Lucente, Peraino, Johnson, and Yoksoulian without prejudice. The Court denies the motion as to James's claim against Defendant Acey.

Date: 3/16/2026

United States District Judge
Franklin U. Valderrama

22